**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

2/21/2025

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

PETER BRAKE

       *Plaintiff,*

    v.

LIBERTY UNIVERSITY, INC.,
JONATHAN FALWELL, DONDI E.
COSTIN, ASHLEY REICH, STEVE
FOSTER, and STEVE FERRO

       *Defendant.*

Civil Action No.___6:25cv00017___

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Peter Brake ("Plaintiff" or "Dr. Brake"), by and through his undersigned attorneys, as and for his Complaint against Defendants Liberty University, Inc. ("Liberty University" or "Liberty"), Rev. Jonathan Falwell ("Falwell"), Dondi E. Costin ("Costin"), Ashley Reich ("Reich"), Steve Foster ("Foster"), and Steve Ferro ("Ferro"), (collectively, "Defendants"), alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

**THE NATURE OF THIS ACTION**

1.     This case arises out of discrimination and retaliation in violation of Plaintiff's rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et *seq*., the Uniformed Services Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4311-4335, and the Virginia Whistleblower Protection Law ("VWPL"),VA Code § 40.1-27-3.

2.     Plaintiff is a lawyer and retired United States Army Judge Advocate who served over 21 years in the active and reserve components.

1

3.      Up until the wrongful actions by Plaintiff's former employer, Liberty University, and Liberty's senior executives, Falwell, Costin, Reich, Foster, and Ferro, Plaintiff was employed as a full-time Civil Rights Investigator in Liberty's Office of Equity and Compliance/Title IX, and also held positions as a part-time online adjunct professor in Liberty's School of Law and Liberty's Helms School of Government.

4.      During his employment with Liberty, Plaintiff reported for active duty with the United States Army, and took a three and a half year leave of absence from Liberty.

5.      When Plaintiff returned to work at Liberty, he was subjected to discrimination by Defendants based on his protected veteran status, in violation of Plaintiff's rights under USERRA.

6.      Plaintiff made good faith reports to his supervisors concerning his discriminatory treatment, prohibited under the USERRA.

7.      Plaintiff also made good faith reports to his supervisors of multiple violations of federal law under Title IX, including, *inter alia*, sexual harassment of his co-workers within the Office of Equity and Compliance/Title IX, non-compliance with grievance procedures required under Title IX, and violations of Liberty's reporting obligations under the Clery Act, 20 U.S.C. § 1092(f).

8.      Although Plaintiff had received exemplary performance reviews, Defendants terminated Plaintiff from his employment in less than a year of his reemployment following his active military duty.

9.      Defendants terminated Plaintiff without cause other than his protected status as a veteran and/or in retaliation for Plaintiff's protected activity, that is, because Plaintiff opposed discrimination and reported multiple violations of law to Liberty's leadership and senior managers.

10.     Plaintiff therefore brings this action for relief based on causes of action for violations of Title IX, USERRA,  and the VWPL.

## THE PARTIES

11.     At all relevant times, Plaintiff was a resident of the Commonwealth of Virginia, and he is currently a resident of Woodbridge, Virginia.

12.     At all relevant times, Plaintiff was an employee of Defendant Liberty University.

13.     Defendant Liberty University is a Virginia corporation that operates as a private evangelical Christian University and is located in Lynchburg, Virginia.

14.     At all relevant times, Liberty University was Plaintiff's "employer" as that term is defined by all applicable statutes and laws.

15.     Liberty University receives federal assistance.

16.     Upon information and belief, Defendant Rev. Jonathan Falwell ("Falwell") is, and at all relevant times, was a resident of the Commonwealth of Virginia and the Chancellor of Liberty University.

17.     Upon information and belief, Defendant Dondi E. Costin ("Costin"), is, and at all relevant times, was a resident of the Commonwealth of Virginia and the President of Liberty University.

18.     Defendant Ashley Reich ("Reich"), is, and at all relevant times, was a resident of the Commonwealth of Virginia and Liberty's Senior Vice President of University Compliance.

19.     Defendant Steve Foster ("Foster") is, and at all relevant times, was a resident of the Commonwealth of Virginia and Liberty's Executive Vice President of Human Resources.

20.     Defendant Steve Ferro ("Ferro"), is, and at all relevant times, was a resident of the Commonwealth of Virginia and Liberty's Executive Director of Talent Development.

3

## JURISDICTION AND VENUE

21.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because: (i) the federal law claim arises under the Constitution and statutes of the United States and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

22.    This Court has personal jurisdiction over Defendant Liberty University on the grounds that it conducts business within the Commonwealth of Virginia.

23.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTS

### I.    Plaintiff's Background and Employment at Liberty University

24.    Plaintiff graduated from Liberty University in 1994, where he was an aviation student and studied government.

25.    Plaintiff later received his Juris Doctor at Quinnipiac University and became an attorney.

26.    Plaintiff also holds multiple other graduate degrees, including a Master of Arts in Human Services Counseling from Liberty. Currently, he is a graduate student at Liberty, working on his third master's degree.

27.    Plaintiff enjoyed a successful career as a lawyer and is a retired Judge Advocate who served over 21 years in the United States Army Reserve (13 active years).

28.    Plaintiff became employed by Liberty University in January 2018 as a Military Education Coordinator.

29.    In June 2019, Plaintiff began working as a Civil Rights Investigator in Liberty's Office of Equity and Compliance/Title IX ("OEC/Title IX" or "OEC/Title IX Office").

30.    In addition to his full-time job as a Civil Rights Investigator, Plaintiff held part-time teaching positions at Liberty as an online adjunct professor at both Liberty's School of Law and Liberty's Helms School of Government.

31.    Plaintiff held the rank of Assistant Professor at both the Law School and the Helms School.

**A. Plaintiff Reports for Active Military Duty in January 2020 and Returns to Liberty in October 2023**

32.    In 2019, Nathan Hopkins ("Hopkins") was the Executive Director/Title IX Coordinator of the OEC/Title IX Office, where Plaintiff was working as a Civil Rights Investigator.

33.    On or about January 2020, Plaintiff was ordered to report for active military duty in the United States Army, and accordingly took a leave of absence from Liberty.

34.    Plaintiff served on active duty with the U.S. Army for over three and one-half years.

35.    While he was absent from work and away on active military duty, Plaintiff learned from his co-workers that Robert Ritz, Chief Financial Officer of Liberty, was referring to Plaintiff in staff meetings as the "Brake problem" an expression of his view that Plaintiff's military leave was a "problem."

36.    Hopkins was making disparaging comments regarding Plaintiff's active military duty, and erroneously telling other employees, including Liberty's senior leadership, that Plaintiff would not be returning to work.

37.     Plaintiff also learned from his co-workers that Stephany Steger, then Liberty's OEC/Title IX Deputy Title IX Coordinator, was referring to him as a "squatter," an expression of Liberty's dismay at having to hold Plaintiff's position during his military duty.

38.     On or about October 2020, Plaintiff sent Hopkins a letter in which he made clear his intent to return to his position at Liberty and his rights to "prompt reinstatement" under USERRA.

39.     On October 2, 2023, Plaintiff returned from active duty to resume his position at Liberty's OEC/Title IX Office as an investigator.

40.     On his first day back at Liberty, Plaintiff found his office a mess, ransacked, and without a desk chair or basic supplies.

41.     Upon Plaintiff's return from military service, Ashley Reich ("Reich"), Liberty's Senior Vice President of University Compliance, informed Plaintiff that she had cut one of Plaintiff's previously negotiated employment benefits.

42.     One week after Plaintiff's return to the OEC/Title IX Office, Reich conducted a meeting with Plaintiff.

43.     Plaintiff asked Reich about his salary and the pay increases that had been given to his colleagues while he was away on active duty.

44.      Reich refused to discuss salary increases to which Plaintiff was entitled under USERRA and told Plaintiff that she would not discuss his salary until the following year.

45.     Reich falsely told Plaintiff that he was making the same as his colleagues in the OEC/Title IX Office.  Reich also lied to Plaintiff about the salaries Liberty was paying to recently hired investigators.

46.     Two weeks after learning that Plaintiff would be returning to the office from active military service, Reich hired a Deputy Title IX Coordinator for Intake and Support, without affording Plaintiff the opportunity to apply for the position, as required by USERRA, although Plaintiff was better qualified than the individual Liberty hired for the position.

47.     Upon his return from active military duty, Reich asked Plaintiff why he was in the OEC/Title IX Office and told Plaintiff that her husband served a few years in the National Guard but saw no value in it and left.

48.     Reich told Plaintiff that he was "lucky" that another investigator in the office had been fired so that she could take Plaintiff back to his position as an investigator.

49.     Plaintiff reminded Reich that she must comply with federal law under the USERRA.

**B. November 15, 2023:  Plaintiff Reports Title IX Violations to Liberty President Dondi Costin**

50.     On November 15, 2023, during a reception for military veterans, Plaintiff told Liberty University President, Dondi Costin ("Costin") that there were problems in the OEC/Title IX Office.

51.     Costin's asked whether the "problems" were Reich or "Friesema," the latter being a reference to Nathan Friesema ("Friesema"), who was then Liberty's Title IX Coordinator and Plaintiff's direct supervisor in the OEC/Title IX Office.

52.     Plaintiff told Costin that the OEC/Title IX Office was violating Title IX regulations.

53.     Plaintiff informed Costin that OEC/Title was ignoring requirements under Title IX for equitable and fair grievance procedures and outcomes.

54.    Plaintiff told Costin that Friesema was pre-investigating cases and directing their outcome by telling Civil Rights Investigators in the OEC/Title IX Office how cases should be determined, in violation of Title IX.

55.    Plaintiff also told Costin that OEC/Title IX was not adhering to Title IX's required timelines for complaint resolution and adjudication, and that OEC/Title IX had open cases that had sat idle and unresolved for more than a year.

56.    Plaintiff told Costin that Liberty should have an outside investigator look into the violations.

57.    Costin, a retired major general in the United States Air Force, who had served as Chief of Chaplain of the United States Air Force, thanked Plaintiff, and told him that the information meant more coming from Plaintiff than it would from Friesema since Plaintiff was a retired United States Army Judge Advocate.

58.    Plaintiff handed Costin a signed letter, which also informed Costin that Friesema was prejudging Title IX cases. Costin asked Plaintiff if the letter was anonymous, and Plaintiff told Costin that he had signed the letter.

59.    Plaintiff's letter likewise informed Costin that Friesema was instructing Plaintiff to take pro forma steps so that he (Friesema) could dismiss Title IX cases. Plaintiff's letter indicated that Friesema had told Plaintiff to "make a call and I'll just dismiss the claim."

60.    In his letter, Plaintiff also noted that he was the only employee in the OEC/Title IX Office, including its six investigators and Title IX Coordinator, who was an attorney. Plaintiff informed Costin that the lack of qualified professionals in the OEC/Title IX exposed Liberty to risk and its students to grave consequences.

61.    Under federal Title IX regulations, Liberty's complaint resolution process was required to be conducted by trained officials, serving impartially and without prejudgment of the facts at interest.

62.    Plaintiff's letter also described for Costin how, on his first day back from military service, he found his office "ransacked" and Reich had asked why he was in the OEC/Title IX Office, and told him that her family found no value in military service.

63.    On November 17, 2023, Plaintiff was called into Reich's office along with Friesema.

64.    Reich presented the letter that Plaintiff had written to Costin and berated Plaintiff for over an hour.

65.    On November 18, 2023, Plaintiff emailed Costin that he believed his job was in jeopardy.

66.    On November 20, 2023, Costin emailed Plaintiff: "I'm confident your leadership understands that retaliation is not allowed around here, so don't give that possibility another thought."

67.    Within days of Plaintiff's communications with Costin on November 15, 2023, Plaintiff complained to HR that Reich had unlawfully cut one of his negotiated benefits upon his return from active military duty, and that she had refused to discuss salary increases upon his return to his position, in violation of USERRA.

68.    Plaintiff complained to HR that Reich had failed to comply with USERRA and with Liberty's own anti-discrimination policy, which prohibited discrimination based on an individual's veteran status, when she denied Plaintiff pay increases aligned with his colleagues, which Plaintiff would have received but for his absence during the period of his active duty.

69.    In or about December 2023, Plaintiff received a Teams message from Steve Ferro, HR's Executive Director of Talent Development, that Liberty's Human Resources office was restoring Plaintiff's employment benefit which Reich had removed.

70.    Plaintiff was later given a $3,000 raise, to which he was entitled under USERRA, and retirement contributions and bonuses that Plaintiff would have received but for his absence during military service.

## C.  March 2024:  The United States Department of Education Imposes a $14 Million Fine Against Liberty University for Clery Act Violations

71.    The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") is a federal law that imposes certain recordkeeping and disclosure requirements on colleges and universities that participate in federal financial aid programs. 20 U.S.C. § 1092(f).

72.    On March 5, 2024, the United States Department of Education ("Department of Education" or "Department") and Liberty University entered into a settlement agreement to resolve findings by the Department which concerned Liberty's non-compliance with the Clery Act. *See U.S. Department of Education Imposes $14 Million Fine Against Liberty University for Clery Act Violations,* (March 6, 2024), https://www.ed.gov/about/news/press-release/us-department-of-education-imposes-14-million-fine-against-liberty.

73.    In a 108-page Final Program Review Determination ("FPRD"), the Department focused its finding on the University's failure to provide required information and assistance to victims of sexual violence at the time an incident was reported and certain staff training deficiencies. *See* FPRD at page 29, available at:  https://studentaid.gov/sites/default/files/Liberty-FPRD-2024.pdf.

74.     Among the Department's findings were that Liberty had failed to comply with numerous sexual violence prevention and response requirements of the Clery Act, including those that were added by Section 304 of the Violence Against Women Act. 34 U.S.C. § 12291(a). *Id.* at 24.

### D.  Mid-April 2024:  Plaintiff Learns of Possible Clery Act Violation

75.     On or about February 8, 2024, two Liberty employees who worked as OEC/Title IX Civil Rights Investigators in Plaintiff's office, John Doe ("Doe") and Jane Roe ("Roe"), were both fired for sexual misconduct for having a sexual relationship with each other.[1]

76.     In or about the week of April 8-12, 2024, Plaintiff was shown a text message sent by Roe to Alice Adams ("Adams"),[2] another OEC/Title IX investigator, in which Roe described her sexual relationship with Doe in terms that indicated it had been non-consensual.

77.     Roe had texted Adams that Doe "didn't take [her] no for an answer."

78.     The text messages showed that Adams had advised Roe to file a Title IX complaint against Doe for sexual assault, but that Roe had replied that no one would believe her.

### E.  April 22, 2024:  Plaintiff Reports Clery Act and Title IX Violations to Ashley Reich

79.     On April 22, 2024, Plaintiff met with Reich in his office and had an hour-long discussion with her concerning what he believed were multiple violations of Title IX and the Clery Act committed by the OEC/Title IX Office.

80.     Plaintiff described to Reich the text message Roe had sent Adams, in which Roe indicated that Doe "didn't take [Roe's] no for an answer."

81.     Under Title IX and the Clery Act, Liberty was required to investigate and report sex offenses occurring on its campus (forcible or non-forcible).

---

[1] "Jane Roe" and "John Doe" pseudonyms.
[2] "Alice Adams" is a pseudonym.

82.    Plaintiff informed Reich that he suspected a possible Clery Act violation, based on Liberty's failure to report a Clery Act crime (sexual assault) involving Liberty employees.

83.    Plaintiff also told Reich that, under Title IX, the OEC/Title IX Office was required to investigate Roe's report of non-consensual sex (sexual assault) by her co-worker, Doe.

84.    Under Title IX, Liberty was also required to provide Doe, as a Liberty employee who reported that she had been a victim of dating violence and/or sexual assault, a written explanation of her rights and option under Liberty's policies and procedures.  *See* 20 U.S.C. § 1092(f) and 34 C.F.R. § 668.46.

85.    Referencing the $14 Million settlement with the Department of Education for Liberty's violations of its Clery Act obligations, Reich remarked that Liberty "can't survive another one of these."

86.    Plaintiff also complained to Reich of what he believed in good faith were multiple other violations of Title IX being committed within the OEC/Title IX Office.

87.    Plaintiff told Reich that Friesema was violating Title IX requirements by prejudging Title IX cases.

88.    Plaintiff also told Reich that Friesema had been sexually harassing his subordinate employees within the OEC/Title IX Office.

89.    Plaintiff also informed Reich that Friesema had wrongfully "banned" from campus an accused respondent in a Title IX case, which prevented the accused from entering campus to attend investigative interviews and any other case related meetings.   The respondent in this case was a Liberty employee ("Janice Spratt" or "Ms. Spratt") with a known mental impairment who had been erroneously accused of "stalking" by a male employee.

12

90.    Plaintiff told Reich that Friesema had no authority to "ban" Ms. Spratt from campus under OEC/Title IX policy.  Under Liberty's policy, only campus police had authority to ban an individual from campus.

91.    When Friesema lied to Ms. Spratt that she had been "banned" from campus, he also unlawfully deprived her of her right to participate and defend herself in her Title IX process.

92.    Plaintiff further complained to Reich that Friesema was unlawfully refusing to dismiss or adjudicate Ms. Spratt's case in accordance with Title IX.

93.    During case update meetings, which were attended by Plaintiff, Friesema, and Reich, Plaintiff had repeatedly told Friesema and Reich that he (Plaintiff) had investigated Spratt's case and had found no evidence to substantiate the allegations against her.

94.    During the case update meetings, Friesema indicated that he would neither dismiss nor adjudicate the complaint against Spratt, stating that he did not want to adjudicate Spratt's case because the evidence against her was so weak that she would likely be found not responsible. Friesema also stated that he did want to dismiss Spratt's case because HR was hoping Spratt would resign and wanted him (Friesema) to wait to dismiss the case until after Spratt resigned.

95.    During the case update meetings, Plaintiff had urged Friesema to dismiss the complaint against Spratt or adjudicate her case, in accordance with Spratt's rights as a respondent under Title IX,[3] while Reich remained silent, seated next to Friesema.

96.    On April 22, 2024, Plaintiff also complained to Reich that OEC/Title IX had been discriminating against participants in Title IX grievance proceedings on the basis of sex.

97.    Plaintiff complained to Reich that OEC/Title IX had failed to investigate a counter-claim made by a male respondent against a female complainant, whom the male respondent had

---

[3] When Friesema finally dismissed the complaint against Ms. Spratt, he did so after she resigned, and he knowingly sent notice of the dismissal to her at her Liberty email address, fully aware she could no longer access it.

alleged knowingly exposed him to a sexually transmitted disease. The male respondent's allegations, if true, constituted a violation of Liberty's Non-Title IX Sexual Harassment policy.

98.    Plaintiff reminded Reich that under Title IX, the male respondent was entitled to be presumed not responsible for misconduct alleged by the female complainant, and that the failure to investigate the male respondent's counter-complaint constituted discrimination on the basis of sex, in violation of Title IX.

99.    Prior to April 22, 2024, Plaintiff had complained to Reich for several months that Friesema was failing to serve neutrally in his role as a Title IX Coordinator, as required under Title IX.

100.    Plaintiff had complained to Reich that, during the initial intake meeting between the investigator and the complainant, Friesema asked the complainant leading questions and embellished complaints by adding descriptors to the complainant's words, (e.g., stating "the professor had sexual desire in his eyes" to support allegations of leering), in order to trigger potential violations of Liberty's Title IX/Sexual Misconduct policy.

101.    Plaintiff complained that Friesema was steering cases by forcing complainants into a Title IX process, in violation of their rights under Title IX.

102.    At the end of their meeting on April 22, 2024, Reich told Plaintiff that, "it seems I have some things to look into."

103.    However, in the days after Plaintiff told Reich of these violations, Reich began to ostracize Plaintiff, avoiding speaking to Plaintiff and looking the other way when she passed him in the hallway.

104.    A week or so later, Plaintiff was subjected to a humiliating and unusual interrogation by Liberty's HR department.

**F.  May 1, 2024: Human Resources Interrogates Plaintiff**

105.    On or about May 1, 2024, Plaintiff was summoned to HR where he was subjected to a videotaped interrogation for more than an hour by Steve Ferro, HR's Executive Director of Talent Development.

106.    After ordering Plaintiff to sit in front of a wall-mounted camera, Ferro interrogated Plaintiff concerning allegations that Plaintiff had told other Liberty employees that Friesema was "in the hot seat."

107.    Plaintiff did not recall making any such statement, and it was not the type of statement for which an employee would normally be interrogated by HR.

108.    When Plaintiff subsequently learned from an independent third party that his alleged "hot seat" statement  had allegedly been made *three months* before his interrogation by Ferro, it became apparent to Plaintiff that his purported "hot seat" comment was a pretext to interrogate him in retaliation for reporting multiple violations of law to Reich on April 22, 2024.

109.    During his interrogation, Plaintiff repeated to Ferro what he had previously told Reich concerning Title IX violations within the OEC/Title IX Office and the Clery Act violation involving the two former OEC/Title IX investigators, Doe and Roe.

110.    When Ferro erroneously stated that the issues concerning Doe and Roe were "resolved," Plaintiff explained to Ferro that Liberty was in violation of the Title IX and Clery Act based on its failure to investigate and report apparent sexual violence by Doe against Roe.  Plaintiff also stated that Liberty should hire outside counsel to investigate the conduct in the OEC/Title IX Office.

111.    During the interrogation, Ferro told Plaintiff in a manner that was both dismissive and threatening that he knew that Plaintiff was seeking a promotional position at the Law School.

15

112. At the invitation of Liberty School of Law's faculty hiring committee, Plaintiff had recently applied for a residential faculty position.

113. Although Plaintiff had been invited by the head of the faculty hiring committee to apply for the position and Plaintiff's interactions with leadership at the Law School were all positive, no one from the Law School ever contacted Plaintiff after his interrogation by Ferro.

**G. Plaintiff Supports His Co-Worker in Reporting Sexual Harassment by Friesema**

114. Following Plaintiff's interrogation by Ferro, Plaintiff's co-worker, Cindy Charles ("Charles"),[4] an Education Specialist in OEC/Title IX, approached Plaintiff and another co-worker, Daphne Dawson ("Dawson"),[5] a Civil Rights Investigator within the OEC/Title IX Office, to discuss sexual harassment by Friesema that she had experienced during her employment.

115. Under Liberty's policies, both Plaintiff and Dawson were mandatory Title IX reporters who were required to report Charles's report of sexual harassment to the OEC/Title IX Office.

116. On or about May 6, 2024, Dawson, with Plaintiff's assistance, emailed Reich to report Charles's allegations of sexual harassment, as well as Dawson's own experience of being subjected to Friesema's sexually-charged comments in the workplace.

117. The email described Friesema as making sexually inappropriate comments to Charles, such as sharing a personal anecdote about a high-school teacher having sex with a student.

118. The email indicated that Friesema had also subjected Dawson to "jokes" about sexual assault and bragged to Dawson that he sold t-shirts on his ETSY shop with the logo—"I Love Butt Stuff"—a crude reference to anal sex.

---

[4] "Cindy Charles" is a pseudonym. *See supra* note 1.
[5] "Daphne Dawson" is a pseudonym.

119.    Reich ignored Dawson's report of sexual harassment until Dawson refused to attend work meetings when Friesema was present.

120.    On May 13, 2024, Friesema was suspended, and OEC/Title IX staff were told that Liberty had hired an outside law firm, Gentry Locke, to conduct an investigation.

121.    On May 14, 2024, a Gentry Locke attorney sent Plaintiff a text message, asking him to send any documents or emails from Plaintiff's own personal email account.

**H.  May 15, 2024: Gentry Locke's Investigation Focuses on Plaintiff's Involvement in Dawson's May 6 Email to Reich**

122.    Plaintiff told the Gentry Locke attorney that his investigation into allegations of sexual harassment by Friesema should comport with Liberty's Title IX policy.

123.    Plaintiff told the Gentry Locke attorney that Liberty had failed to provide Charles a notice of allegations, notice of her rights under Title IX, or supportive measures, as a reporting party, as required by Liberty's Title IX policy and federal regulations.

124.    The attorney from Gentry Locke asked Plaintiff if he had assisted Dawson in writing the email she had sent to Reich on May 6, 2024.  The Gentry Locke attorney shared with Plaintiff that Reich had told him that the font in Dawson's email was not the font she normally used, but was the font normally used by Plaintiff.

125.    It was evident from the questions posed by the Gentry Locke attorney that Reich was focused on trying to determine who was involved in writing the complaint against Friesema rather than investigating the allegations that Friesema had sexually harassed his subordinates.

126.    At Liberty's direction, the investigation conducted by Gentry Locke for Liberty was not conducted pursuant to Title IX but was being treated as an employment matter.

127.    Liberty had hired Gentry Locke (rather than use a Title IX investigator) to ensure that the investigation of alleged Title IX sexual harassment of subordinate employees by Liberty's Title IX Coordinator would be hidden by attorney-client privilege.

128.    The Gentry Locke attorney told Plaintiff in confidence that his report was comprehensive and "damning" for Reich.

129.    The Gentry Locke attorney also expressed to Plaintiff that the purported "hot seat" comment Plaintiff had allegedly made about Friesema was a pretext to interrogate Plaintiff in retaliation for his statements to Reich on April 22, 2024 concerning Title IX and Clery Act violations.

130.    On or about May 15, 2024, Plaintiff reported the Jane Roe/John Doe allegations to both the Gentry Locke attorney, as well as to Liberty's Clery Compliance Officer, Dr. Todd Campo.

**I.    May 15, 2024:  Plaintiff Files a Complaint Against Liberty with the United States Department of Education's Office of Civil Rights**

131.    On or about May 15, 2024, Plaintiff filed a complaint with the Department of Education's Office of Civil Rights ("OCR"). Plaintiff's complaint to the OCR, summarizing the allegations of Title IX violations which he had reported to Reich on April 22, 2024, and his subsequent interrogation by HR on May 1, 2024.

**J.    May 30, 2024: Plaintiff Files a Written Complaint against Reich with the OEC/Title IX Office**

132.    On or about May 30, 2024, Plaintiff filed a complaint against Reich with Liberty's OEC/Title IX Office.

133.    Plaintiff addressed his complaint to Diane Padilla ("Padilla"), an attorney from Lathrop GPM, who was then serving as Liberty's Interim Title IX Coordinator.[6]

---

[6] After Friesema was suspended on May 13, 2024, on June 21, 2024, Reich informed employees within the OEC/IX Office that Friesema, Liberty's Title IX Coordinator, was no longer employed by Liberty.

134.    Plaintiff OEC/Title IX complaint made two allegations.

135.    First, Plaintiff's complaint alleged that after reporting violations of Title IX and the Clery Act to Reich, he was subjected to an interrogation by HR on May 1, 2024 "as a pretext to silence [him] and punish [him] for making a report that [he] was legally required to make."

136.    Plaintiff alleged that this retaliation constituted a violation of Section 6.8 of Liberty's "Sexual Misconduct Policy."    Section 6.8 of Liberty's Sexual Misconduct Policy provides, in part, that:

> Retaliation and Interference with Process is an act of intimidation, threat, Coercion, discrimination or any other adverse action or threat thereof against any individual for the purpose of interfering with any right or privilege secured by Title IX, its regulations, or this Policy or because the individual has made a Report or Formal Complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this Policy. Encouraging or assisting another person to engage in retaliation or to interfere with the process are also considered Retaliation and Interference with Process and violate this Policy. . . . [A]cts that could constitute Retaliation and Interference with Process may include, but are not limited to: acts or comments that are intended to discourage a person from engaging in activity protected under this Policy or that would discourage a reasonable person from engaging in activity protected under this Policy; . . . adverse changes in employment status or opportunities . . . . .

https://www.liberty.edu/title-ix/wp-content/uploads/sites/126/Liberty-University-Sexual-Misconduct-Policy.pdf.

137.    Plaintiff's complaint also alleged a violation of Liberty's Nondiscrimination and Equal Opportunity Policy on the basis that, he was subjected to poor treatment and discrimination, including Reich's elimination of part of his pre-service negotiated benefits, on the basis of his military status, in violation of his rights under the USERRA.

138.    Plaintiff alleged that, although HR later adjusted his salary and restored his benefits months later, Reich had subjected him to discrimination and mistreatment, in violation of his rights under the USERRA and also alleged a violation of Liberty's Nondiscrimination and Equal Opportunity Policy.

139.    Liberty's Nondiscrimination and Equal Opportunity Policy affords "protected class status" to military veterans and specifically provides that, in accordance with applicable federal law, the University "does not unlawfully discriminate on the basis of . . . military veteran status."[7]

### K. Liberty Fails to Investigate Plaintiff's Complaint Against Reich

140.    Under the Sexual Misconduct Policy, Liberty was required to provide Plaintiff a "prompt and equitable process" for the resolution of his retaliation complaint, see section 12 of the Sexual Misconduct Policy, but Liberty took no such action.

141.    Under the Nondiscrimination and Equal Opportunity Policy, the OEC/Title IX Office's Executive Director or Title IX Coordinator (or his/her designee) was required to "conduct an initial review" of Plaintiff's complaint of alleged discriminatory treatment.

142.    On or about June 3, 2024, Padilla did a pro forma "initial intake" interview with Plaintiff concerning his complaint against Reich.

143.    For the next three weeks, Plaintiff heard nothing more from Padilla or Liberty concerning his complaint against Reich.

144.    Then, on June 24, 2024, Padilla emailed Plaintiff stating that she would set up a meeting for outside counsel to "learn more about your [Plaintiff's] complaint."

145.    Two days later, Plaintiff was fired.

### L. June 26, 2024: Liberty terminates Plaintiff's Employment

146.    On June 26, 2024, Plaintiff was fired via a Teams call with Reich and Steve Foster, Liberty's Executive Vice President of HR.

147.    Plaintiff was told that he was being terminated because of purported "compliance" issues that Reich and Foster refused to identify.

---

[7] https://libertyedu.public.na2.doctract.com/doctract/documentportal/08DC692D6DDF89376D955BFB6181B3CD?slu=08DCDF64B22ADF5BD06C2A189A3A3369.

148.    Two hours after Plaintiff was fired, an attorney from an outside law firm, Tueth Keeney, contacted Plaintiff for a telephone conference concerning his complaint against Reich.

149.    To this day, Plaintiff never heard back from the outside counsel from Tueth Keeney or anyone at Liberty regarding his complaint.

150.    On June 26, 2024, Plaintiff emailed President Costin and Rev. Jonathan Falwell ("Falwell"), the Chancellor of Liberty University/

151.    In his email, Plaintiff reminded Costin and Falwell that, in November, he had "reported several issues related to Liberty's Title IX office" to Costin, and when he subsequently wrote Costin that "VP Reich was threatening [his] employment," Costin emailed Plaintiff to assure him that Liberty would not allow retaliation.

152.    In his June 26, 2024 email, Plaintiff complained to Costin and Falwell that he was now being terminated, and that "the only thing that [he] did was report violations of law and policy and reprisal by VP Reich."

153.    Throughout his employment at Liberty, Plaintiff committed no misconduct or violation of Liberty policy, and was meeting all of his employer's legitimate expectations.

154.    At the time of Plaintiff's abrupt termination of employment, Plaintiff had been recognized as a high performer for his work as a Civil Rights Investigator and had received a glowing 90-day evaluation in February 2024.

155.    Prior to being terminated, no one at Liberty had ever mentioned to Plaintiff any issue with his performance or "compliance."

156.    When Liberty terminated Plaintiff's employment, it terminated him both from his position as a Civil Rights Investigator and from his part-time adjunct faculty positions at the Law School and the Helms School of Government.

157.    Plaintiff was given no reason for his termination from his teaching positions at the Law School or the Helms School, where he had worked since 2020 and 2018, respectively, and where he had received consistently glowing performance reviews from his faculty supervisors.

158.    At the time of his termination, Plaintiff had recently been promoted to the rank of Assistant Professor at Liberty's Helms School of Government, and he was one of few if not the only faculty member at the Helms School of Government with both a doctorate in criminal justice and a law degree.

159.    When Liberty terminated Plaintiff's employment, Liberty's Helms School of Government was about to offer Plaintiff a promotional position as Online Chair.

160.    Plaintiff has been wrongfully terminated from Liberty University within less than a year of his return from active duty in the United States Military, in violation of his right to be free of discrimination under the USERRA.

161.    Plaintiff has been wrongfully terminated in retaliation for engaging in protected activity based on one or more of the following:

>    (i)    reporting violations of Title IX and USERRA to President Costin on November 15, 2023;
>    (ii)    reporting multiple Title IX violations and a suspected violation of the Clery Act to Reich on April 22, 2024;
>    (iii)    participating and assisting in Dawson's email report to Reich on May 6, 2024 regarding allegations of sexual harassment within the OEC/Title IX Office;
>    (iv)    reporting non-compliance with Title IX to Liberty's hired counsel, Gentry Locke, on May 15, 2024,
>    (v)    filing a complaint concerning Title IX violations to the OCR on May 15, 2024;
>    (vi)    filing a complaint against Reich for discrimination and reprisal with OEC/Title IX on May 30, 2024.

## II.    Plaintiff's Has Suffered Immense Damages

162.    Plaintiff has suffered physical and emotional pain and suffering.

163.    Plaintiff has suffered damage to his professional reputation and lost career opportunities.

164.    Plaintiff's termination of employment has cut short his career opportunities as a faculty member at both Liberty's Law School and the Helms School of Government.

165.    Liberty has blocked Plaintiff's application at the Law School for a promotional position and also blocked the anticipated offeror for Plaintiff to serve as chair at the Helms School of Government.

166.    Plaintiff's termination of employment by Liberty has hindered his chances of securing faculty or leadership roles at other educational institutions in the future.

167.    Plaintiff has suffered economic damages as a result of these lost academic opportunities, including the income he earned from teaching online courses at Liberty's Law School and the Helms School of Government.

168.    In addition to losing his salary and income at Liberty, Plaintiff's termination of employment resulted in the loss of the benefit of tuition reimbursement for his children, spouse, and himself to attend Liberty University for free.

169.    As a consequence of Plaintiff's wrongful termination, and the foreseeable consequences it caused to Plaintiff's career and personal life, Plaintiff has endured significant emotional pain and anxiety, as well as the stress of the uncertainty for his and his family's future.


**[CONTINUED ON NEXT PAGE]**

## CAUSES OF ACTION[8]

## COUNT I

## Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### Retaliation
### (As to Defendant Liberty University, Inc.)

170.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

171.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

172.    Liberty is an "educational program" under Title IX and is a recipient of federal funding.

173.    "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination' prohibited under Title IX."  Doe v. Morgan State Univ., 544 F. Supp. 3d 563, 584 (D. Md. 2021) (quoting Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005)).

174.    At the pleading stage, a plaintiff sufficiently alleges a Title IX retaliation claim by alleging (1) that the employer took an adverse employment action against him, (2) because  he "engaged in protected activity under Title IX" Feminist Majority Found. v. Hurley, 911 F.3d 674, 694 (4th Cir. 2018); Doe v. Morgan State Univ., 544 F. Supp. 3d 563, 584 (D. Md. 2021).

175.    Plaintiff engaged in Title IX protected activity, including, inter alia, when:

   a.  On November 15, 2024, Plaintiff reported to President Costin that his supervisor, the Title IX Coordinator, was prejudging Title IX cases and ordering Plaintiff to take pro forma steps to have them dismissed;

---

[8] Plaintiff has timely filed a complaint with the Virginia Attorney General, Office of Civil Rights. Plaintiff is awaiting his right to sue letter and thereafter shall assert claims under the Virginia Human Rights Act.

  b. On Aril 22, 2024, Plaintiff reported violations of Title IX and the Clery Act to Reich;

  c. On May 1, 2024, during a videotaped interrogation of Plaintiff by HR official Steve Ferro, Plaintiff reported to Ferro what he had previously reported to Reich concerning suspected Title IX violations by Friesema and a Clery Act violation involving the two OEC/Title IX investigators, Doe and Roe;

  d. On May 6, 2024, Plaintiff participated in making a report to Reich of allegations of sexual harassment of OEC/Title IX employees, Charles and Dawson, by the Title IX Coordinator;

  e. On or about May 15, 2024, Plaintiff told outside counsel from Gentry Locke that its investigation into Charles's sexual harassment allegations failed to comport with Charles's rights under Title IX;

  f. On or about May 15, 2024, Plaintiff reported alleged Title IX violations to the OCR; and

  g. On or about May 30, 2024, Plaintiff filed a complaint against Reich for alleged Title IX retaliation with Liberty's OEC/Title IX Office.

176. Liberty's retaliatory motivation against Plaintiff is demonstrated by the actions taken by Plaintiff's supervisor and HR officials preceding his termination of employment. These actions include, inter alia, the following:

  a. Reich berating Plaintiff for more than an hour on November 16, 2024, for his November 15, 2024 letter to President Costin;

  b. Ferro interrogating Plaintiff on May 1, 2024, following Plaintiff's April 22, 2024 report to Reich, and Ferro's oblique threat that he was aware Plaintiff had applied for a promotional position with the Law School; and

  c. The focus by Gentry Locke's investigator into the font used in Dawson's May 6, 2024 email rather than the substance of the Title IX sexual harassment allegations described therein.

177. Plaintiff suffered adverse action by Liberty when Liberty terminated his employment, on June 26, 2024, for no legitimate remedial or disciplinary purpose, for purported "compliance issues."

178.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

179.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendant Liberty, awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, damages to reputation, plus attorneys' fees and an order enjoining Defendants from imposing upon Plaintiff any bar to working on campus, including any bar against teaching.

## COUNT II
### Discrimination – Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311(a)
**(As to Defendants Liberty University, Inc., Jonathan Falwell, Dondi Costin, Ashley Reich, Steve Foster, and Steve Ferro)**

180.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

181.    The Uniformed Services Employment and Reemployment Rights Act ("USERRA") "broadly prohibits discrimination in the hiring, rehiring, and retaining of servicemembers." Kitlinski v. United States Dep't of Just., 994 F.3d 224, 229 (4th Cir. 2021); 38 U.S.C. 4311(a).

182.    "A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation."  38 U.S.C. § 4311(a).

183.    "To succeed on a claim under § 4311(a), a servicemember must show (1) that his employer took an adverse employment action against him; (2) that he had performed, applied to perform, or had an obligation to perform as a member in a uniformed service; and (3) that the employer's adverse action was taken on the basis of' that service, such that the service was 'a motivating factor' in the action." Id.; Harwood v. Am. Airlines, Inc., 963 F.3d 408, 414-15 (4th Cir. 2020); (quoting 38 U.S.C. § 4311(a), (c)(1)).

184.    Pursuant to USERRA § 4316(c), "[a] person who is reemployed by an employer under [USERRA] shall not be discharged from such employment, except for cause within one year after the date of such reemployment, if the person's period of service before the reemployment was more than 180 days."

185.    USERRA defines an "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including ... a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. § 4303(4)(A).

186.    USERRA's accompanying regulations likewise state that an employer includes "any person ... that has control over employment opportunities ...." 20 C.F.R. § 1002.5(d)(1).

187.    Accordingly, there is individual liability under the USERRA. Tolle v. PocketSonics, Inc., 342 F. Supp. 3d 695, 706 (W.D. Va. 2018).

188.    Here, where Plaintiff served for more than three and a half years, Liberty was prohibited from discharging him within a year of his reemployment except "for cause." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006); 38 U.S.C. § 4316(c).

189.    Defendants Costin, Reich, Forster, and Ferro, each had the decision-making authority to retain, discipline, or terminate Plaintiff's employment with Liberty, and each acted collectively and/or independently not to retain Plaintiff and to terminate Plaintiff's employment.

190.    Plaintiff was discriminated against in violation of USERRA when he was unreasonably discharged, and without cause unrelated to Plaintiff's military service.  See § 43223(d)(1).

191.    Defendants willfully violated Plaintiff's rights under the USERRA by showing reckless disregard for whether its conduct was prohibited by the Act.

192.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT III
### Retaliation – USERRA, U.S.C. § 4311(b)
**(As to Defendants Liberty University, Inc., Jonathan Falwell, Dondi Costin, Ashley Reich, Steve Ferro, and Steve Foster)**

193.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

194.    The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), § 4311(b) "prohibits employers from taking any adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under USERRA or has exercised a right provided for in USERRA."  Kitlinski v. United States Dep't of Just., 994 F.3d 224, 229 (4th Cir. 2021) (internal citation and quotation marks omitted) (quoting 38 U.S.C. § 4311(b)).

28

195.    To succeed on a claim under § 4311(b), an employee must show that (1) the employee engaged in protected activity under USERRA, and (2) that protected activity was "a motivating factor in the employer's action." 38 U.S.C. § 4311(c)(2). Kitlinski, 994 F.3d at 229.

196.    Plaintiff's termination of employment was an act of retaliation and reprisal.

197.    At the time Liberty terminated Plaintiff's employment, Plaintiff had recently been recognized for his exemplary performance in his position as a Civil Service Investigator (with a glowing 90-day evaluation).

198.    Plaintiff had also been recognized for his part-time work as an adjunct faculty, having recently been promoted to a position as an Assistant Professor at Liberty's Helms School of Government, and anticipating an offer for a promotional position as Online Chair at the Helms School of Government.

199.    Plaintiff had committed no violation of Liberty policy or purported "compliance issues."

200.    On May 30, 2024, Plaintiff filed a formal written complaint asserting he had been discriminated against by Reich on the basis of his protected veteran status, in violation of his rights under USERRRA.

201.    Defendants Liberty, Falwell, Costin, Reich, Ferro, and Foster individually or collectively made the decision to terminate Plaintiff, and each was aware of his prior protected activity under USERRA.

202.    Defendants' termination of Plaintiff's employment was an act of retaliation and reprisal for his prior protected activity under USERRA.

203.    Defendants' violations of USERRA were willful.

204.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

### COUNT IV
### Virginia's Whistleblower Protection Act ("VWPA"), VA Code § 40.1-27-3
### (As to Defendant Liberty University, Inc.)

205.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

206.    Under Virginia's Whistleblower Protection Act ("VWPA"),

> An employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee:
>
> . . . in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official;
>
> . . . Refuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason; or

Va. Code § 40.1-27.3(A).

207.    The VWPA "prohibits employers from retaliating against an "employee [who] in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." Wood v. Bristol Virginia Util. Auth., 661 F. Supp. 3d 538, 550 (W.D. Va. 2023) (construing Va. Code § 40.1-27.39(A)(1)).

208.    Here, Plaintiff in good faith reported violations of federal law and regulations to his supervisors, including, inter alia, when,

    a.   On November 15, 2023, Plaintiff reported violations of Title IX and USERRA to President Costin in a letter;

    b.  On April 22, 2024, Plaintiff reported to Reich violations Title IX sexual harassment of employees within the OEC/Title IX Office by the Title IX Coordinator and a suspected violation of the Clery Act based on text messages between two OEC/Title IX Office investigators;

    c.  On May 1, 2024, Plaintiff reported to Liberty HR official, Steve Ferro, the same violations of federal law he had reported to Reich on April 22, 2024;

    d.   On May 6, 2024, Plaintiff assisted Dawson in emailing Reich a report detailing Title IX sexual harassment of OEC/Title IX employees, Dawson and Charles;

    e.  On May 15, 2024, Plaintiff informed Liberty's third-party investigator, an attorney from Gentry Locke, of Title IX violations within the OEC/Title IX Office, including a failure to follow federal law in investigating allegations of Title IX sexual harassment by an employee within the OEC/Title IX Office;

    f.  On May 30, 2024, Plaintiff filed a complaint alleging Title IX violations by Liberty to the OCR;

    g.  On or about May 30, 2024, Plaintiff filed a formal written complaint with OEC/Title IX against Reich, alleging she had violated his right to be free of retaliation under federal law, that is, Title IX's anti-retaliation provisions, and the anti-discrimination provisions of USERRA.

209.   In retaliation for Plaintiff's good faith reports of these violations of federal law, Plaintiff was berated by his supervisor, subjected to a videotaped interrogation lasting more than an hour, and Plaintiff was ultimately terminated from his employment, for no other cause than his good faith reports to his supervisors of violations of federal law within and by the OEC/Title IX Office.

210.   Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff prays for the following relief:

(i)    On the first count of violation of Title IX of the Education Amendments of 1972, (retaliation), a judgment against Defendant Liberty University, Inc.:

    a.    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b.    injunction to restrain continued violation of this section, requiring Defendant (i) to destroy all documents and records concerning Dr. Brake's termination from his employment, (ii) the reinstatement of Dr. Brake to the same positions held before the retaliatory action or to equivalent positions, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs;

(ii)    On the second count of violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), (discrimination), a judgment against Defendant Liberty University, Inc.:

    a.    damages in an amount to be determined at trial, including, without limitation, damages for lost wages, restoration of pension and other benefits, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b.    injunction to restrain continued violation of this section, requiring Defendant (i) to destroy all documents and records concerning Dr. Brake's termination from his employment, (ii) the reinstatement of Dr. Brake to the same positions held before the retaliatory action or to equivalent positions, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs;

(iii)    On the third count of violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), (retaliation), a judgment against Defendant Liberty University, Inc.:

    a.    damages in an amount to be determined at trial, including, without limitation, damages for lost wages, restoration of pension and other benefits, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b.    injunction to restrain continued violation of this section, requiring Defendant (i) to destroy all documents and records concerning Dr. Brake's termination from his employment, (ii) the reinstatement of Dr. Brake to the same positions

held before the retaliatory action or to equivalent positions, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs;

(iv) On the fourth count of Virginia Whistleblower Protection Law, VA Code § 40.1-27-3, a judgment against Liberty University, Inc.:

    a. damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b. injunction to restrain continued violation of this section, requiring Defendant (i) to destroy all documents and records concerning Dr. Brake's termination from his employment, (ii) the reinstatement of Dr. Brake to the same positions held before the retaliatory action or to equivalent positions, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

### JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:** **February 19, 2025**

Respectfully submitted,

**FARMER LEGAL, PLLC.**
*Attorneys for Plaintiff Peter Brake*

By: /s/ *Joshua T. Farmer*
**Joshua T. Farmer, Esq.**
**5030 Sadler Place, #205**
**Glen Allen, Virginia 23060**
**Tel: 804-325-1441**
**Fax: 804-510-0224**
**josh@farmerlegalhelp.com**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Peter Brake*

By: /s/ *Andrew T. Miltenberg*
**Andrew T. Miltenberg, Esq.**
(***pro hac vice*** **forthcoming)**

33

Stuart Bernstein, Esq.
(*pro hac vice* forthcoming)
Gabrielle M. Vinci, Esq.
(*pro hac vice* forthcoming)
363 7th Avenue, 5th Floor
New York, New York 10001
Tel: 212-736-4500
Fax: 212-736-2260
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
gvinci@nmllplaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

-------------------------------------------------------------------X

**PETER BRAKE**

        *Plaintiff,*

   **v.**

**LIBERTY UNIVERSITY, INC., JONATHAN**
**FALWELL, DONDI E. COSTIN, ASHLEY REICH,**
**STEVE FOSTER, and STEVE FERRO,**

        *Defendant.*

-------------------------------------------------------------------X

     I, **Peter Brake,** hereby declare, subject to the penalties of perjury pursuant to 28 U.S.C. §

1746:

     1.      I am the Plaintiff in the above-entitled action.

     2.       I have read the annexed Complaint, know the contents thereof, and the same are

true to my knowledge, except as to matters alleged upon information and belief and as to those

matters, I believe them to be true.

     I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is

true and correct.

**Dated: New York, New York**
      **February 19, 2025**

BRAKE.PETER.MA
RK.1257226758
Digitally signed by
BRAKE.PETER.MARK.1257226758
Date: 2025.02.19 10:23:28 -05'00'

       **Peter Brake**